Good morning. Good morning, Your Honors. My name is Gregory Weston, and I'm representing both of the plaintiff appellants in this consolidated appeal. I'd like to start out by mentioning what product at issue here actually says on its label. It says the following, sexual power and performance. It's called Intense X, which is a pun on the phrase intense sex. And the way the letters are makes the pun even more clear. It says it's fast acting, laboratory quality. Intense X is designed to intensify your endurance, power, and sexual performance. It also has a URL to their website, and that URL, if you go to it, has even more explicit claims that this is an unapproved new drug, or that show that it's an unapproved new drug. These include health impotence, prolonged performance, aphrodisiac, helps impotence, improves libido, formulated to rev up your sex drive. The FDA, there's a lot of, there's a very big market for aphrodisiacs and impotence drugs that people will pay a lot of money for to avoid the embarrassment and the expense of going to their doctor to get a prescription medication for this. And, of course, before the prescription medication became available, namely Viagra, there was no approved treatment by the government for impotence. Let me ask you, one of the big things that you're appealing is the class certification issue. That's correct. The court found that, I guess, that there wasn't typicality, commonality, kind of hit the whole thing on there, that you didn't meet that. If you do not prevail on that issue, if this court, and I'm talking hypothetically, all right, but if you don't prevail on the class certification issue, what's left? Well, we would proceed to trial on any individual claims. And how many people do you have on that? We have two plaintiffs. Two of them. Yes. So what is their access to damages at that point if it's not a class? So they both used it, I think one said four times, and the other maybe eight times or ten times or something? I think the purchases were six total, six bottles. Okay. So what other damages do they have available besides what they spent on it? Because they're not injured, right? Well, they do not claim a physical injury. That's correct. Okay. So what other damages are available on the claims that would remain if we didn't find in favor of you on the certification issue? Well, we would seek punitive damages, and then the Consumer Legal Remedies Act has statutory damages. I can't tell you what the statutory damages are off the top of my head. And the Consumer Legal Remedies Act also has a mandatory fee shifting towards prevailing plaintiffs. So those would be the at that case, it would actually be the fees that would be the majority of what would be at issue in that case. Okay. So if we assume for the purposes of this question that find that class certification was properly denied, do the two remaining plaintiffs have any website-based claims? I see from the record that there was a problem in demonstrating reliance for purposes of the website-based claim.  Yes. One of them stated under oath that he looked at the website after his initial purchase but before his subsequent purchase, and that was part of the reason he made a subsequent purchase. Well, let's take them one at a time because I think Mr. Sandoval said at a deposition that the website had no effect on whether he was going to purchase Intense X again. No effect. Does that take care of Mr. Sandoval? Yes. And Mr. Canfor didn't say in his testimony that the website was one of his reasons to buy the product, and in the complaint I see no allegation from Mr. Canfor that he relied on the website statement. Does that not take care of Mr. Canfor then? Well, I would say that I don't agree that you have to allege reliance on every particular word in order to challenge it. Was there a statement in the record for Mr. Canfor as to the website-based claims? Yes. He stated in an interrogatory response that that was what he relied on. I'm sorry, I don't have the particular citation off the top of my head, but we do mention it in our opening brief, I believe, and have the exact record citation there. Maybe if you reserve for rebuttal, maybe when you sit down you can pull that site up for us. Okay. But I want to mention a couple other bits of relevance on the website, though. One is that we don't need to allege reliance on every single word that we're challenging as false. Reliance is an element that Prop 64 put on the name plaintiff only, not the other members of the class, and it's not on every single word you're challenging. You have to have relied on something that you're challenging as false. So that's the first element, or the first point I'd like to make about the website. The second point is the website is incorporated by reference, and there's a lot of different both federal authorities in different contexts that say, first of all, anything that explains a drug, even if it's not even referenced on the label, is incorporated. In this case, we have an explicit statement on the label, visit us at Intensex.com. So even though we didn't need anything that explicit, it's enough that it's a brochure, a pamphlet, a website that's not referenced, we have that reference that makes that all the stronger. Well, I think, are you thinking in terms of Cordell, that interpreted labeling to include materials accompanying a written label? Yes. A written label, I'm sorry. Yes, and I'd like to mention some further relevance of the website. One is that it's also probative of what the rest of the label means. It's an expansion of what. So to the extent there's any dispute that Intensex is designed to intensify your endurance, power, and sexual performance, if there's any dispute that that's an aphrodisiac, we then go to the website, and the website specifically uses the word aphrodisiac. So it is probative evidence of what the label means. Maybe it's not conclusive, but on summary judgment, I think that calling everything puffery, and that exact statement, intensify your endurance, power, and sexual performance, the court said was puffery, and said it doesn't matter that you have an expert saying that it's false. It doesn't matter that you have plaintiffs saying, I believe I was defrauded here. Nonetheless, it's puffery. Well, the Intensex product label does not expressly refer consumers to the website for additional specific information for the product. It just directs consumers to the website for, quote, unquote, comments or questions. So why should we consider the website as part of the label? Based on the authority that's in our brief, and also it says visit us here. Well, based on, are you talking Cordell or what? I mean, when we talk authority, I kind of like to be a little more specific, rather than that there's some authority out there. Okay, that's something else I'll do a rebuttal and give the court the specific cases in our brief that mention that it's incorporated by reference. But taking only the label itself, again, Intensex is designed to intensify your endurance, power, and sexual performance. This is the definition of aphrodisiac from the FDA, 21 CFR 310.528. Any product that bears labeling claims it will arouse or increase sexual desire or improve sexual performance is an aphrodisiac drug. Improved sexual performance is an aphrodisiac drug. Designed to intensify your endurance, power, and sexual performance. That, I think, is an aphrodisiac drug. We found a product that violated the 21 CFR 310.528, just flat-out violated it. And then the FDA, after that, says some of the types of claims that have been found in aphrodisiac drugs, that the regulation then goes on to say, labeling claims for aphrodisiacs for OTC use are false, misleading, and unsupported, and they're misbranded in violation of federal criminal statutes, even, unless they get an approved new drug application, which didn't happen here. Are you talking about the disease claim, or what are you talking about here? I'm talking about, in this case, the claim on the label, Intensex is designed to intensify your endurance, power, and sexual performance. And I'm saying that violates 21 CFR 310.528. And this is kind of a cut-and-dry case for that reason. Can you talk to me about the disease claim? Well, the disease claim, I think, is maybe not an exact phrase to use. What the defense is using here is there is a softening of the regulation that applies to things like vitamin C pills, and that is called the Nutrition Supplement Education Act. And what that does is provides an exception to the very harsh penalties, including criminal penalties, to the sale of unapproved new drugs. And there's multiple elements that have to be met before you can escape the regulation of new drugs for your nutrition supplements. One is that you have to have a disclaimer in bold. And this does have a disclaimer, but it's not in bold. And it also — Not in what? It's not in boldface. And it's very clear it's not in boldface because there's other text on the same panel that is in boldface. There's two typefaces, bold and unbold, and it very clearly is not in the bold typeface. The next issue is it needs to be prominent, and it's in the very bottom of the side panel, and it might be the single least prominent thing on the entire label, if you actually look at it. So this mechanical element, it just simply fails. And it also needs to be true. True and not misleading is something else that you need to have in order to qualify for the reduced federal regulation under the nutrition supplement rule. And we allege, and this allegation had to be taken true at the motion to dismiss, and at the summary judgment stage we provided evidence that the product is not actually true. And, in fact, the FDA's regulation says it's not true. It doesn't just say it's illegal. The FDA makes a point to say aphrodisiac drugs because the FDA examined the evidence, and the FDA said these aphrodisiac drugs are false, misleading, and unsupported. That's the FDA's word for drugs. Well, it's fine if it doesn't imply treatment of disease. So why doesn't this disclaimer that specifically says this product is not intended to diagnose, treat, cure, or prevent any disease taken outside of the realm of aphrodisiacs that the FDA would say it's not okay? Well, it's first off because it's not prominent and not bold. That's the easiest and most mechanical one. But, remember, this is an exception to a rule that provides lower regulation. It doesn't mean it's unregulated. It means that it doesn't fall into the realm of drug regulation. And I disagree, and it's a little bit more of a complicated issue, and I disagree that it doesn't make disease claims. Impotence is a disease. It's a recognized disease that there's actual approved drugs that went through the FDA and DA process for it. The website claims that Intense X, quote, may help impotence in men, unquote, and should be used, quote, if you suffer from, dot, dot, dot, impotence, unquote. And the website also states that ginseng, one of the ingredients in Intense X, should be used by those inflicted with a myriad of diseases including arthritis, allergies, high blood pressure, and rheumatism. So it's labeling on the website, but that's not the label itself. I think your allegation is makes impermissible disease claims and should be considered a drug, which leads to the conclusion that Sandoval has an actionable claim that Intense X is marketing an uncertified drug. Is that what you're saying? Yes, that's exactly right. And but I think the ‑‑ But on that you'd have to win under Cordell that the website claims are part of the labeling. Yes, but again, not on the website, on the label itself, Intense X is designed to intensify your endurance, power, and sexual performance. I think the reference to endurance is a reference, without being too graphic, to impotence. Maybe something less than complete impotence. And, you know, that I think is a reasonable inference from it. And that is on the label. And that's part of the relevance of the website. Even if we're not talking about what the website means to the plaintiff himself, there's also the question, it's an objective question on whether or not it makes impermissible disease claims. And the website elucidates what exactly endurance and sexual performance means. If you're having problems with your endurance and sexual performance, those are euphemisms for impotence. We think that's the case. I think that's reasonable just as a matter of common sense. But then we go to the website and it confirms it. So the website, independent of our plaintiff's claims, is evidence for what is on the label and what those statements on the label mean. And I think on summary judgment and the motion to dismiss, these are things that the inference should support us. Label and labeling are kind of terms of art, right? I think in the FDA context, yes. So we can't really use them interchangeably, I don't think. Label and labeling, I don't know if they mean different things. Well, the label, like on the product, is one thing. Labeling can include what's on the label and incorporated. Yes, that's a good way of putting it. Am I getting that wrong? We're using label to mean what's physically on the box. And labeling at the FDA is a term of art that's broader, that includes pamphlets, websites, even a video that if it's shown to potential people who want the prescription. So we have to be careful when we use those words, right? Yes. Do you want to save any time for rebuttal? You don't have to. Yes, unless there's any particular questions I should answer now. But I guess you'll have better questions after rebuttal. So, yes, I'll save my five minutes. All right. And you'll look for those sites. Yes, I will. Good morning, Your Honors. James Harris, Rappalese. This Court should affirm, because there's undisputed evidence by way of admissions that the plaintiffs did not rely on any website statements, and the district court correctly determined as to the alleged falsity of the label claims that plaintiffs had and made out their case. Well, it's a little more complicated than that. You know, let's assume I asked him the question just hypothetically right now that the class is not certain that the affirmance on the certification issue. Yes. Okay, then it goes back. But it seems that the Intense-X label states that Intense-X is designed to intensify your endurance, stamina, and sexual performance, and includes a seal stating that it is, quote-unquote, laboratory quality tested, unquote. How do you explain the term intensify in this context as meaning anything other than to increase? And if it does mean increase, isn't that a measurable, testable claim that goes beyond puffery? It's a – okay. You're focusing on the falsity issue with respect to the label claims. Well, I'm looking at – just let's assume – I mean, obviously, if there isn't certification, we have two people left. But then you have – you've got the label, you've got the website. I think Judge Wynn pointed out that it appeared that they didn't rely on the website, so that might get rid of some. Yes. But labeling is different than label, and so labeling can incorporate the website. And so I've raised some issues about why haven't they stated – you know, why haven't they stated something to say that they're treating a disease by things that are saying on the website, and then that affects the preemption argument and a lot of things. Well, I acknowledge, if the website were – And I'm trying to – you know, you can sweep out certain things without class certification, but then we have to drill down on all these other things. Yes. And it's always easy on summary judgment to look at it and say this just doesn't look like a really big case now and that it's – you know, it's puffery. But I'm trying – but we have to give all inferences in favor of the plaintiffs here, and there are some things that seem to be problematic for your client. Okay. With respect to the website, as Judge Nguyen pointed out, there are admissions from both of them that they didn't rely on. So that takes care because I'm, I think, struggling with the same issues that Judge Callahan is. We have to basically drill down on all the different types of claims asserted here. Yes. So can you start with where Judge Callahan directed you, which is essentially with the false advertising claims, the way I think of it is that there are false advertising claims under UCL, FAL, and CLRA, both for the website claims, and let's assume that those go by the wayside. What about the false advertising claims based on the statements on the label itself, meaning the box? Yes. The statements on the box, the district court held, first of all, that the website statements are not incorporated onto the box, and that's in accordance with well-established law. If you look at the Wilson v. Frito-Lay case. But just the box itself. Okay. Okay. Okay. You're right. There are a lot of issues floating around at the same time. With respect to the box itself, you just look at the four corners of the box, the district court said those cannot be disease claims because the FDA has authoritatively determined in the wake of the 1994 legislation that claims like those do not imply the treatment of disease, that they are simply, in terms of substance, structure and function claims. So you can't prove that those claims are false by saying they don't cure a disease. As a matter of the district court's analysis, they're not disease claims, and, therefore, you just have to look at them as whether the structures. Well, I think there's two separate issues that you need to help me on here. Yes. With regard to the statements on the box themselves. Yes. I think there are potentially false advertising claims. So those would go under State law, California law. Yes, they would. And so anything that's more than puffery, the plaintiff goes forward or survives summary judgment on false advertising claims under the FAL and CLRA, setting aside whether it's disease claims or not. Right? So that's one little bucket of claims. And then the second bucket of claims is that if you take the statements on the box and you couple that with the website, then that gets to disease claims. And to me, that's the bucket of violation of federal law and whether it should be regulated or not. So I look at it, I visualize it as two little buckets of claims. Your conceptualization is correct. Let me start with the website incorporation claims, which you mentioned last. As a matter of well-established federal law, the website claims cannot be considered incorporated on the label. What about Cordell and the notion that labeling is interpreted very broadly? Well, that's not exactly what Cordell said. Cordell said you take a look at the relationship between what's on the label and other accompanying materials, and if there's a strong connection between the two, you can consider them part of the label. In that case, in Cordell, it was a flyer that was inserted in the box with the drugs. So there was obviously a strong connection there. In the Frito-Lay v. Wilson case, which is a district court case. So why isn't a reference on the label, for questions or comments, visit us at www.intents.com? Why isn't that the same as mailing a separate flyer in the box? Because if you take a look at the Wilson v. Frito-Lay case, the FDA has dealt with this precise question. They've issued guidance, which all the district courts that have considered this issue have followed. Under the FDA's guidance, and I'm going to quote, and this is quoted in the Wilson v. Frito-Lay case, if the label for a product contained a statement that referred the customer to a specific website for additional information about a claim, the website is likely to be labeling. It is not, I stopped quoting then, it's not considered labeling if a quote directs consumers to the website for more facts about the labeled product without directing to the website for further information about the specific claims. So I urge you to take a look at Wilson v. Frito-Lay. And all the district court cases around the country that have analyzed this issue have held that under circumstances like this, a generic please visit us at our website is not sufficient to constitute labeling within the meaning of Cordell and the meaning of section 312M of the FDCA, which statutorily codifies the rule that under certain circumstances other material can be considered part of the label. Okay, so let's go to the other bucket about false advertising. Okay, with respect to false advertising there are, and I'm going to focus on the claims on the box. Not the website. There are three, excuse me, three related but independent reasons why the district court was correct. Under California law it's a very high standard to prove falsity. You have to prove that a reasonable consumer would have considered, would have been likely to be misled. And you have to prove more than lack of substantiation or inconclusive evidence, you have to prove that the claims actually are provably false. And the district court said if you take a look at their expert declaration, the district court basically said that their expert declaration doomed their case. And I think it's correct. Their expert said that the vague language used with respect to intense effects on sexuality has no support as such terms are scientifically undefined and untestable. And the district court said that means that no reasonable consumer is likely to take a look at those promises and view it as having made a specific enforceable promise. Excuse me, I misspoke. No reasonable consumer is going to take a look at the language on the box and say that it creates specific advertising claims, enforceable promises that are provably false. For the exact same reason, the statements on the box are at best mere puffery. Yeah, but they have some little, they've got some little stamp that sounds like it's approved, too. Right? Don't they have some kind of stamp on the box? Laboratory quality tested. They're only talking about... What does that mean? It wasn't laboratory quality tested, was it? Well, yeah, the ingredients are. That's only a statement... What's the product? Laboratory quality tested? Laboratory quality tested. That's a reference to the hygiene. So the manufacturing, that's not a reference to... Well, I mean, the other argument would be it says like it does what it says it's going to do. I don't think that's, I don't think that's, they haven't made that, they didn't make that argument below and I don't think that's a fair reading of what the box says. That's a generic thing that's put on labels routinely that is... We're just supposed to know that means they don't throw junk in there? Yes, yeah, they're not putting in adulterated products. They adhere to hygiene standards. Laboratory quality tested. Yes, and it refers to the purity of, you know, the various herbal supplements that are contained in the product. And that's referring to the purity of those ingredients, that the ginseng is really ginseng and they test to make sure it's really ginseng as opposed to, as opposed to other things. Mr. Harris, I'm trying to understand the California False Advertising Statute. You won't be the first. Okay, well, Judge Huff here says three things. One, it's vague, the claim. Two, it's puffery. Three, the declaration is without substance of the expert. Yes. Now, here's what. I've got a case called Coastal Abstract Service. It's a Ninth Circuit 1999 case, and it tells me that to survive here, a claim has to be a specific and measurable claim capable of being proved false or being reasonably interpreted as a statement of objective fact. Yes. Why isn't the label claim a statement of objective fact if reasonably interpreted? Because it's vague. It's nonspecific. It's not like a fact saying if you take this product, your erection will last 33% longer. It's not saying that it's going to act within one minute. It's not specific and measurable. If you look at the cases on puffery, and this is something that's been litigated a lot, the distinction is between generalized, vague, and subjective, and specific, detailed, and factual. And it's hard for me to see how this is specific and detailed and factual. I don't see it as making a specific promise. And if you look at some of the other cases that we cited, the Nathanson case from the Fifth Circuit, a fast-acting drug, puffery. The Ostreicher case from the Northern District of California, faster, more powerful, more innovative than other machines, puffery. If this is not puffery, an awful lot of what you saw in the Super Bowl yesterday is going to be considered false advertising claims. Advertisers every single day make generalized claims that have little specific content and that are not deemed to make enforceable promises. Do you have a case where there are statements of this sort, intensifying endurance, coupled with the seal of laboratory quality tested, where a court has said that that constitutes puffery? I don't have the citation to it. It's the Virgil case that's cited in our briefs that says that. I mean, virtually the exact same claims on a very similar record. And conversely, there are no cases that I'm aware of that say claims like this are not puffery. But that's only part of the analysis. That's only one of the independent reasons why the false advertising claims fall. If you take a look at the substantiation standard, going back to what you quoted from that earlier opinion, you have to prove that something is demonstrably and measurably false. It's not enough to prove that there's just inconclusive evidence. It's not enough to prove that the jury's still out on the efficacy of a product. And if you take a look at the expert's declaration, and this strongly motivated the district court judge here, if you take a look at the district court, their expert declaration, putting aside the vague conclusions that he draws at certain parts, if you look at the substance of his conclusions, he testifies no more than that there's a lack of substantiation as to the efficacy of some of the individual ingredients in this product. He acknowledges, and this is at page 224, paragraph 16 of the record, that there are a small number of studies that suggest a positive effect of particular ingredients. That's an admission on their part that there is no proof of actual falsity. If you look at his ingredient-by-ingredient analysis of the components of the product, he again acknowledges that there are plenty of studies that show some efficacy for individual ingredients. We put in the record, supplemental excerpt of the record 314, a study that says men using red ginseng experience significantly better sexual function than while taking a placebo.  And their expert said, well, there are two studies that do support the efficacy of ginseng. I don't think they were particularly well-constructed studies, but that's not a demonstration of provable falsity. That actually is an admission, an acknowledgment, that they're unable to meet their burden of demonstrating falsity under the California statutes. I would like to talk to you about the disease claims because it's my understanding that the district court said that, found that USC 310.528 was not applicable, and the label of intense X did not make any disease claims, and therefore the state law claims were expressly preempted by the FDCA. Yes. But if we were to apply the expansive definition of labeling under 310.528 and 21 CFR 101.93, and found that the district court was wrong about the disease claims, then the state law claims would not be preempted. Is that, am I correct in the analysis there? Is that how the analysis goes if we don't agree with it? I'm kind of going hypothetically. If we don't agree, if we said the district court was wrong on the disease claim analysis, then the district court's analysis on preemption would not be correct either, right? The district court's analysis on preemption is far narrower than is made out in the plaintiff's brief. What the district court said is if you take a look at the three statements on the box, they're identical to statements that the FDA has said are structure function claims, and so for purposes of state law, those cannot be considered disease claims. The district court did not say that their state law claims are barred. It simply said that those statements cannot by themselves be considered disease claims, and you have to look, when you're just looking at the box, you have to look at them as either provably false or substantiated structure function claims. But if I were to conclude, just hypothetically, and I'm not saying that the website claims do make disease claims, how does the analysis go from there? The district court in its motion to dismiss declined to preempt, declined to hold that some of the statements on the website were, I'm confusing myself with too many negatives, were not disease claims. The district court acknowledged that some of the statements on the website could be construed as disease claims, and so that's the district court's view of the matter. But those are still alive and well? Well, they're not alive and well because of lack of reliance. The two plaintiffs didn't rely on the website, and as I said, if you take a look at the Wilson v. Frito-Loy case and the FDA guidance within that case, I am confident you'll conclude that the website is not incorporated. If we're talking the physical label, but if we look at labeling, that's a different thing. It might be a different analysis. Labeling and label are not, we've all agreed, are not exactly synonymous claims. Well, I'm not sure what you mean by labeling. I know you asked plaintiff counsel that question. The analysis is under Cordell and under Section 312M is whether the things on the website are considered, quote, accompanying such article, the article being the box. And the FDA's guidance, as I've said, is that unless the reference on the box directs you to specific information about a specific claim, as opposed to just saying go take a look or go visit us, the statements on the website are not considered to be part of the label as that term is defined. And labeling is defined as all the labels that meet the standard of 312M. So they're really equivalent statements. So the inquiry is whether under the cases interpreting 312M, the website statements are deemed incorporated onto the label. And as I say, Wilson v. Frito-Lay, Samet, all the other cases that we cited in the brief say no. And there are no cases, not a single case anywhere around the country, that adopts the analysis that the plaintiffs are urging here. Okay. Do the plaintiffs have to demonstrate reliance under the unlawful prong of the UCL? The individual plaintiffs do, and Plaintiff's Counsel admitted that in his remarks. And the first- Show reliance even if they go under the unlawful prong of the UCL? Yes. A quick set says they have to with respect to each and every one of the California statutes. And I know your dissent last week in the Hyundai case goes in a slightly different direction on that point. And you said in your dissent that the tobacco cases say that reliance is not necessary for every single plaintiff. But with all due respect, I don't think that's what the tobacco case said. I think tobacco, the Supreme Court squarely held that reliance is an element of all these kinds of statutory claims. And the language that you quoted deals with the special situation of when you have a decades-long, widespread advertising campaign. And under those circumstances, you don't have to prove that each plaintiff saw a particular advertisement because, as a matter of common sense, courts know that every single consumer out there saw at least one advertisement. So there's reliance as a matter of presumption. But that's not the same thing as saying that somebody who admits that they didn't rely on the website can avoid demonstrating reliance or can avoid proving reliance. Unless the panel has additional questions, we've taken you over time. So your time would be expired. There appear to be additional questions. Thank you. Thank you. I just wanted to quickly answer the questions that were posed to me at the end of my opening statement. The first one is dealing with the plaintiff's statements about when they viewed the website and what its relevance was. And the citation for the first one for Mr. Kanfer is at ER-202. And then there is a longer one for ---- What does it say? Pardon? What does it say? What does it say? It says that, well, essentially what 202 is, is defense counsel reads out the statement in the interrogatory response where he says that he saw the website and it was part of his decision-making purchase. The belief was bolstered by the representations included on the website in tensex.com. And this is quoting the interrogatory response. And then defense counsel then proceeds to verify that this is the plaintiff's actual view and not just something counsel came up with, and that's what we have for Kanfer. And then for Sandoval ---- I don't understand what you just said. Oh, I'm sorry. I believe the question was where in the record ---- Where in the record does it show reliance on one of the people said that they didn't rely on the website and you conceded that. And then the other one, you said you had sites that said they did rely on the website. I perhaps should not have conceded it having looked at the deposition testimony now on both plaintiffs. I apologize for that. Again, for Kanfer, the statement explicitly is he says he read the statements and believed them, and then this belief was bolstered by the representations included on defendant's website. In other words, he recounts the claims on the label and then says he went to the website and believed the website and relied on it, and that bolstered the beliefs that were in the label. Was that after he bought or was that before he bought? It was after the initial purchase but before the subsequent purchases. So the reliance on the website would have been for the subsequent purchases only. And were you reading from a deposition that confirmed an interrogatory answer? Is that what you were doing? Yes, that is what I was reading from. And that is ---- All right. Thank you. Thank you. And then rather than talk about interrogatory response around ER, I think 303 is when the more lengthy soliloquy about Mr. Sandoval's visit to the Intensex website begins. But he specifically says after his first purchase, the very day he went to the website and he read the reviews and they were generally positive, and at that point he decided to actually take the pill and he continued taking the pill after a subsequent purchase. So, in other words, his decision to take them, if not the initial purchase, was made after viewing the website and then he purchased it a subsequent time. So there is the reliance for both plaintiffs. And then the other question that was posed to me was about Cordell. And, I mean, we have a few other cases besides Cordell, but Cordell was the good one in the binding. Here is another one that I guess is from the Northern District. Labeling under the FDCA is construed expansively and may encompass every form of promotional activity, including inserts, pamphlets, mailing pieces, fax bulletin, reprints of press releases. Is that published? Pardon? Is it published? That is a Lexis citation. So is it published? It's not published in the Federal Supplement. So it's not binding on us, right? No, no. But then getting to Cordell, I'll just quote from Cordell now. One article or thing is accompanied by another when it supplants or explains it in the matter of a committee report of the Congress accompanying a bill. No physical attachment one to the other is necessary. So I think you can definitely say that the website qualifies as supplementing or explaining it. It does both. For instance, the label has the ingredient list, and then the website explains why those ingredients were included in there. And I think it explains also the claims on the front. And then just a final word about puffery. You really can't say that every single thing on the front of it is puffery because the point of puffery is it's an outrageous statement that precludes reliance. And they took one statement out of context from our expert report. Our expert report says these things are fake, it's been extensively studied, and they show that there is not any evidence for it, for these things. And I'm going to conclude, based on my own knowledge of these things, that it is not true. And not only is it not true, I am worried, and I have personal experience knowing that men who have sexual problems are reluctant to go to the doctor, and they may have an underlying physical problem that includes diabetes or prostate cancer. And if they see this product that's so convenient, $10 near the checkout stand, they're not going to go to the doctor as soon as they otherwise will. They're going to wait a few months to see if this Intense X might work, and that is going to potentially kill them because their prostate cancer is detected later. I don't know if that happens often, but I think it does happen at least a few times. All right. So we have your arguments in mind. You've taken a little additional time, but I've allowed that. Okay. Thank you very much, Your Honor. This case will be submitted. I thank both of you for your argument. And this Court will be in recess until tomorrow at 9 a.m. Thank you. All rise.
judges: Callahan, Nguyen, Pratt